**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **Criminal Action No. 08-123 (RMC)** |
| | ) | |
| **v.** | ) | **(related to** |
| | ) | **Criminal Action No. 07-329 (RMC))** |
| **YAHYA ZAITAR** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## OPINION

On May 14, 2012, Yahya Ali Zaitar pled guilty to two criminal conspiracies.  In Case No. 07-cr-329, Mr. Zaitar pled guilty to two counts: 1) conspiracy to import and distribute cocaine in the United States; and 2) distribution of cocaine, knowing it would be imported into the United States.  Mr. Zaitar's cocaine co-conspirator in Case No. 07-cr-339 was Mohammed Ali Awali, who separately entered a guilty plea.  In Case No. 08-cr-123, Mr. Zaitar pled guilty to conspiracy to import and distribute heroin in the United States. Mr. Zaitar's heroin co-conspirator was his brother, Nemr Zhayter, who pled guilty to heroin trafficking in Case No. 08-cr-214.[1]  In Yahya Zaitar's plea agreement, the parties estimated an adjusted offense level of 29

---

[1]   Yahya Zaitar and Mohammed Ali Awali were indicted on November 30, 2007, for alleged international trafficking in cocaine in Case No. 07-cr-329.  Yahya Zaitar was later indicted on April 25, 2008, for alleged international trafficking in heroin in Case No. 08-cr-123.  Nemr Zhaytar, brother to Yahya, was indicted for the same alleged international heroin trafficking in July 2008 in Case No. 08-cr-214.  Yahya Zaitar was extradited from Romania and arraigned here in August 2008.  *See* Case Nos. 07-cr-329 & 08-cr-123, Minute Entries dated Aug. 18, 2008.  Mohammed Ali Awali was extradited from Brazil and arraigned here in August 2011.  *See* Case No. 07-cr-329, Minute Entry dated Aug. 30, 2011.  Nemr Zhaytar was extradited from Paraguay and arraigned here in 2011.  *See* Case No. 08-cr-214, Minute Entry dated Feb. 25, 2011.  By Minute Order entered on June 17, 2011, the Court ordered that Case Nos. 08-cr-123 (*U.S. v.*

and criminal history category I, resulting in a sentencing range of 87 to 108 months under the United States Sentencing Guidelines.

On October 10, 2012, this Court sentenced Mr. Zaitar to 108 months' incarceration in both cases, to run concurrently.  Mr. Zaitar promptly appealed, claiming that his guilty plea was involuntary and the product of his trial counsel's promise of a sentence of 87 or fewer months.  The United States Court of Appeals for the D.C. Circuit remanded the case to the trial court for consideration of Mr. Zaitar's claim of ineffective assistance of counsel.

After an evidentiary hearing and full briefing, as well as review of the entire record, the Court finds that trial counsel for Mr. Zaitar was not ineffective and thus denies his request to withdraw his guilty plea.

## I.

Yahya Zaitar entered guilty pleas on May 14, 2012 to two criminal Informations. He pled guilty to a two-count Information in Case No. 07-cr-329.  Count I charged him with a dual-object conspiracy to import 500 grams or more of cocaine into the United States and distribute 500 grams or more of cocaine, intending or knowing that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 952, 959(a), 960(b)(2)(B), and 963, and 18 U.S.C. § 2.  Case No. 07-cr-329, Superseding Information, Dkt. 44.  Count II charged distribution of 500 grams or more of cocaine, intending or knowing that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C.

---

*Zaitar*) and 08-cr-214 (*U.S. v. Zhaytar*), both involving the same alleged heroin trafficking conspiracy, be "informally" joined "for administrative ease."  *See ids.*, Minute Entries dated June 17, 2011.  (For reasons related to the terms of Nemr Zhaytar's extradition from Paraguay, he could not be joined in a single indictment with Yahya Zaitar.)  This prolonged international background intensely complicated trial preparations and necessitated the interpretation of recordings in Arabic, English, Portuguese, Romanian, and Spanish or a combination thereof.

§ 959(a), § 960, and 18 U.S.C. § 2.[2]  *Id.*  Mr. Zaitar also pled guilty to a one-count Information

in Case No. 08-cr-123, charging him with a dual-object conspiracy to import 100 grams or more

of heroin into the United States and to distribute 100 grams or more of heroin, knowing that the

heroin would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 952,

959(a), 960(b)(2)(b), and 963, and 18 U.S.C. § 2.  Case No. 08-cr-123, Superseding Information,

Dkt. 129.[3]  The Plea Agreement reflected the parties' agreement to a base offense level of 30, a

two-level enhancement for an aggravating leadership role, and a three-level downward

adjustment for early acceptance of responsibility, leading to an adjusted Offense Level

29/Criminal History Category I, or a Guidelines range of 87 to 108 months.  Both parties

retained their rights to argue for downward or upward departures or variances from the

otherwise-applicable Guidelines range as it was determined by the Court.

   The plea hearing involved a full colloquy, which was interpreted by a court-

certified Arabic interpreter but also included occasions on which Mr. Zaitar spoke directly in

English.  After explaining the Guidelines calculation proposed in the Plea Agreement, the Court

advised Mr. Zaitar:

> Now, right now, I don't know enough about the facts, or your defenses,
> or you, to know how I should devise a sentence for you.  Everybody has
> agreed that this is the range under the Guidelines, but those aren't
> mandatory.  I have to look at other things, too, and I don't know enough
> today.
>
> *Has anyone promised you what your sentence would be?*
>
> Defendant: *No.*

---

[2]   Before his plea, Mr. Zaitar had faced a Superseding Indictment that had charged five (5)
kilograms or more of cocaine on the conspiracy count.  *See* Case No. 07-cr-329, Superseding
Indictment, Dkt. 6 (under seal); Case No. 07-cr-329, Transcript of Evidentiary Hearing on
Ineffective Counsel, July 14, 2014, Dkt. 102 (Evidentiary Hearing Tr.), at 122.

[3]   Before his plea, Mr. Zaitar had faced an Indictment that had charged one (1) kilogram or more
of heroin.  *See* Case No. 08-cr-123, Dkt 1.

Court:  "Okay.  Because *I don't know, and I'm the one who's going to do it.*  So if it turns out to be more harsh than you hope, you would not be able to withdraw your Guilty Plea. Do you understand that?

Defendant:  Yes.

Case No. 07-cr-329, Transcript of Plea Hearing, May 14, 2012, Dkt. 80 (Plea Tr.), at 18 (emphases added).  Mr. Zaitar's counsel, Barry Coburn, explained that the Plea Agreement left both "parties  . . . free to argue for either a departure or a variance from that range. . . . Up or down."  *Id.* at 23.  During the plea colloquy, the Court further informed Mr. Zaitar that the Guidelines range would be calculated separately by the Probation Office and may be different from the calculation in the Plea Agreement, to which he responded that he understood.  *Id.* at 24.  At the end of the colloquy, the Court specifically asked if Mr. Zaitar "[w]ould … enter a guilty plea because you're guilty or for some other reason?" and he answered, "Because I'm guilty."  *Id.* at 25.  The Court then stated that it was "confident" that Mr. Zaitar understood what he was doing, that his plea was voluntary, and that he understood the consequences of entering a guilty plea.  *Id.* at 25-26.

Notably, Mr. Zaitar's guilty plea followed years in the D.C. Jail after his arrest in Romania on or about April 14, 2008 and extradition to the United States in August 2008.  For a lengthy period of time, Mr. Zaitar affirmatively requested to continue Case No. 08-123 until his brother, Nemr Zhayter, was extradited from Paraguay so that they could confer on a non-trial disposition.  In addition, prosecution in Case No. 07-cr-329 awaited extradition of Mohammed Ali Awali, Mr. Zaitar's cocaine codefendant, who was incarcerated in Brazil.  *See* Case. No. 07-cr-329, Dec. 20, 2012 Status Report, Dkt. 24.  Over time, Mr. Zaitar became sufficiently familiar with the English language to communicate on daily matters and to speak in court when he felt necessary.  Trial was scheduled for either April 18, 2011 or September 19, 2011, *see* Case No.

07-cr-329, Minute Entry dated Aug. 18, 2010, depending on the possible arrival of one or both

co-defendants.  Messrs. Zhaytar and Awali arrived in the United States within months of each

other and trial schedules were postponed so that counsel could prepare.  *See* Case Nos. 07-cr-

329, 08-cr-123, Minute Orders dated Aug. 3, 2011, Sept. 16, 2011, and Nov. 22, 2011.

Ultimately, all three men entered separate pre-trial guilty pleas.[4]

Sentencing for Mr. Zaitar was scheduled for August 21, 2012.  In preparation, the

Probation Office submitted a July 12, 2012 Presentence Investigation Report (PSR) covering

both cases.  *See* Case No. 07-cr-329, Dkt. 54 (Restricted).  The PSR outlined the alleged

conspiracies.  *Id.*  The Probation Office relied on the Guidelines Manual in effect on the dates of

the offenses of conviction, *id.* ¶ 61, and treated the cocaine and heroin quantities admitted by

Messrs. Awali and Zhaytar in their separate plea agreements as related conduct to Mr. Zaitar's

offenses.[5]  These added drug amounts led to an adjusted offense level of 33, resulting in a

Guidelines sentencing range between 135 and 168 months' incarceration.  *Id.* ¶¶ 66, 69, 71, 73,

74, 75.

At the sentencing hearing on August 21, 2012, Mr. Zaitar's counsel strongly

argued that it was improper to combine the drug quantities admitted by Mr. Zaitar's co-

---

[4] Mr. Awali took responsibility for at least 15 but less than 50 kilograms of cocaine.  *United States v. Zaitar*, Case No. 07-cr-329, Dkt. 38 (Awali plea agreement) ¶ 7.a.  A Guidelines range of 87 to 108 months was calculated.  *Id.* ¶ 10.  He was sentenced to 69 months' incarceration. Case No. 07-cr-329, Dkt. 59 (Judgment), at 3; Dkt. 60 (Statement of Reasons) (under seal). Nemr Zhayter took responsibility for at least one kilogram but less than three kilograms of heroin.  *United States v. Zhayter*, Case No. 08-cr-214, Dkt. 109 (Final Presentence Report) (Restricted), ¶ 11.  Mr. Zhayter and the government agreed to an adjusted offense level of 27 and a criminal history category I, resulting in a Guidelines range of 70 to 87 months.  Mr. Zhayter was sentenced to 67 months' incarceration.  *Id.*, Dkt. 118 (Judgment).  Mr. Awali and Mr. Zhayter were not identified as leaders of their respective conspiracies, but Yahya Zaitar was identified as a leader in both.

[5]  PSR at 13 n.3 ("Pursuant to USSG § 1B1.3(a)(1)(B), based on the amount of cocaine and heroin coconspirators Nemr Ali Zhayter and Mohammed Ali Awali pled guilty to, defendant Zaitar is accountable for at least fifteen kilograms of cocaine and one kilogram of heroin.").

conspirators in their own plea agreements when Mr. Zaitar himself was not present, could not confront either man, and did not agree. The Court continued sentencing to allow briefing on the point. *See* Case No. 07-cr-329, Defendant Yahya Zaitar's Memorandum Concerning Relevant Conduct, Dkt. 65 (Def. Conduct Mem.); Government's Supplemental Sentencing Memorandum, Dkt. 68 (Gov. Supp. Mem.).   Mr. Zaitar's legal brief concluded with his counsels' comment that "we did not advise our client that there was any significant likelihood that the Court might reject the range in the plea agreement, since undersigned counsel [have] never seen that occur or heard of it occurring.  Accordingly, should it occur, this may well lead to a cognizable allegation of ineffective assistance of counsel." *Id.* at 13-14.  The Government advised that the Court had the authority to consider the drug quantities admitted by co-conspirators as relevant conduct but urged a sentence for Mr. Zaitar within the negotiated sentencing range of his plea agreement; more precisely, the Government argued for a sentence of 108 months. (Similarly, the Government had argued for sentencing at the high end of the Guidelines ranges for Messrs. Awali and Zhayter.)

The sentencing hearing reconvened on October 10, 2012.  The Court concluded that it could properly add the drug quantities admitted by Mr. Zaitar's co-defendants as relevant conduct to Mr. Zaitar's admitted crimes but that the negotiated sentencing range in Mr. Zaitar's Plea Agreement was "sufficient but not greater than necessary."  *See* 18 U.S.C. § 3553(a); Case No. 07-cr-329, Sentencing Transcript, Oct. 10, 2012, Dkt. 83 (Sentencing Tr.), at 5.  The Court noted:

> Mr. Zaitar and his counsel have advanced a very compelling argument about his young son who is terribly injured and in need of his father.
>
> Mr. Zaitar himself wrote me a very moving letter.  The condition of his family and particularly his son isn't really a consideration under sentencing except under other kinds of circumstances and here, in

6

reading the Government's sentencing memo and the other, the briefs that are before me, the nature of the activity, criminal offense here is broader, deeper, more stark than the evidentiary record might show because we never got to trial.

In comparing those things, I think that I should not sentence Mr. Zaitar to anything higher than the parties negotiated because that would be greater than necessary and therefore inappropriate but I can't get lower than that either.

[The boy's accident] post dates the [illegal] conduct.  So I don't think that I can reduce [Mr. Zaitar's] sentence as a result even though I can sympathize deeply as a human to human person.  As a Judge, I think I am obligated to enforce the law of the United States and that means a sentence of 108 months.

*Id.* at 5-6.  In response to Mr. Zaitar's personal plea for a lower sentence so that he could go home to his family, the following discussion ensued:

COURT:  The efforts to traffic in multiple drugs intended for the United States [were] so great.  You have in fact had excellent representation and received a plea agreement that is so much better than the result had you gone to trial.  I cannot tell you how hard it would be had you gone to trial and been convicted of all the things with which you were charged, and now be facing sentencing.

. . . I'm dealing with an admitted series of crimes against the United States and so you negotiated a plea and I am just holding you to that plea.  That's all.

DEFENDANT:  When they told me that, that maximum 87 months.  The Government cannot give me just one number, they told me that you will give me less than that.

COURT:  Well, they certainly hoped and they certainly argued.  They argued vociferously, strongly for less than that.
But I am not willing to do that.

*Id.* at 8-9.

Mr. Zaitar's immediate complaint of ineffective assistance of counsel rests on his assertion that his counsel promised him a sentence of 87 months or perhaps as short as 80 months.  He also argues that he would have gone to trial and rejected any plea that exposed him

to a sentence of 108 months.  His complaint is directed to defense counsel Barry Coburn and

Lloyd Liu.

## II.

A defendant may not withdraw a plea of guilty after he has been sentenced;

rather, "the plea may be set aside only on direct appeal or collateral attack."  Fed. R. Crim. P.

11(e).  To have the court set aside his guilty plea on direct appeal, a defendant "must show that

withdrawal of his plea is necessary to correct a manifest injustice."  *United States v. Farley*, 72

F.3d 158, 162 (D.C. Cir. 1995) (internal quotation marks omitted)[6]; *cf. United States v. Vonn*,

535 U.S. 55, 72 (2002) (explaining that [former] Rule 32(e) provides incentive to file motions to

withdraw a guilty plea *before* sentencing, as opposed to *after* sentencing:  "Whatever the 'fair

and just' standard may require on presentence motions [to withdraw a guilty plea], the Advisory

Committee Notes confirm the textual suggestion that the Rule creates a near-presumption against

granting motions filed after sentencing . . . .  This is only good sense; in acting as an incentive to

think through a guilty plea before sentence is imposed, the Rule tends to separate meritorious

second thoughts (say, a defendant's doubts about his understanding) and mere sour grapes over a

sentence once pronounced.") (internal quotation marks and citation omitted).

Mr. Zaitar incorrectly relies on factors considered in reviewing a motion to

withdraw a plea *prior to* sentencing, as articulated in the cases he cites, *United States v. Jones*,

642 F.3d 1151, 1156-57 (D.C. Cir. 2011), *United States v. McCoy*, 215 F.3d 102, 106 (D.C. Cir.

2000), and *United States v. Taylor*, 139 F.3d 924, 929 (D.C. Cir. 1998).  Mr. Zaitar references

his "legally cognizable defense" and "legal innocence," Case No. 07-cr-329, Defendant's

---

[6]   *Farley* was decided under then-effective Fed. R. Crim. P. 32(d).  In 2002, the text of Rule
32(d) was moved, with minor stylistic changes, to Rule 11(e).  Advisory Comm. Notes on 2002
Amendment to Fed. R. Crim. P. 11(e).

Memorandum In Support of Withdrawal of Guilty Plea, Dkt. 99 (Def. Mem.), at 11, and argues

that the government will not be prejudiced if his case must go to trial. *Id.* at 15, 16. But these

factors bear on withdrawal of a guilty plea only *before* sentencing. *See Jones*, 642 F.3d at 1156-

57; *Taylor*, 139 F.3d at 929; *McCoy*, 215 F.3d at 106. *See also United States v. Wright*, Case No.

13-cr-94 (BAH), 2014 WL 3919619, at *5 (D.D.C. Aug. 12, 2014) (rejecting *Jones* as the

applicable standard for a post-sentence motion to withdraw guilty plea and applying standard

under 28 U.S.C. § 2255 for ineffective assistance of counsel).

      Contrary to these aspects of Mr. Zaitar's argument, the test for post-sentence

relief from a guilty plea is "manifest injustice." As the D.C. Circuit has stated:

> A plea of guilty may not be withdrawn after sentence except to correct a
> "manifest injustice," and we find it difficult to imagine how "manifest
> injustice" could be shown except by proof that the plea was not
> voluntarily or understandingly made, or a showing that defendant was
> ignorant of his right to counsel. Certainly ineffective assistance of
> counsel, as opposed to ignorance of the right to counsel, is immaterial in
> an attempt to impeach a plea of guilty, except perhaps to the extent that it
> bears on the issues of voluntariness and understanding.

*Edwards v. United States*, 256 F.2d 707, 709-10 (D.C. Cir. 1958). *See also United States v.*

*Watley*, 987 F.2d 841, 844-48 (D.C. Cir. 1993).

      Mr. Zaitar's claim here is that his plea was not voluntary because he suffered

from ineffective assistance of counsel: "Mr. Zaitar's counsels' performance fell below an

objective standard of reasonableness because they failed to correctly apply the Sentencing

Guidelines in order to determine the correct range. Because of counsels' assurances based on the

incorrect Guideline range of 87-108 months that he would get no more than 80 months, Mr.

Zaitar decided to plead guilty and forego his right to a trial." Def. Mem. at 3.

      Such a claim is decided under *Strickland v. Washington,* 466 U.S. 668 (1984). In

*Hill v. Lockhart*, 474 U.S. 52, 58 (1985), the Supreme Court held that a claim that the ineffective

assistance of counsel rendered a plea not voluntary and intelligent must be evaluated under the general two-pronged test for ineffective assistance first set forth in *Strickland*.  Thus, to prevail on his claim that Mr. Coburn provided ineffective assistance, Mr. Zaitar must establish (1) that counsel's performance was deficient, and (2) that counsel's "deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.

## III.

At the time of the hearing on alleged ineffective counsel in July 2014, Mr. Zaitar was 40 years old; he was approximately 38 at sentencing in 2012.  Mr. Zaitar is a native of Lebanon whose native tongue is Arabic.  He has a high school diploma from Lebanon.  He has been incarcerated in the United States since 2008 and has acquired an admirable ability to engage in conversational English.  By 2012, when he entered his plea, his English-language skills allowed some meetings with his counsel to proceed without an interpreter present.  *See* Evidentiary Hearing Tr. at 35 (Zaitar) ("What I understood was what they told me.  I understood everything they told me."); *see also id.* at 40 (Mr. Zaitar did not request an Arabic interpreter at any of six meetings with defense counsel).  Mr. Zaitar also demonstrated his growing English-language comprehension at various in-court hearings, although all court hearings were conducted with a certified Arabic interpreter.  *See* Plea Tr. at 5 (Court: "And do you speak or understand written English?" Defendant: "I believe so.").

Plea negotiations were extensive and continued over many years with different defense counsel, reaching fruition immediately before trial.  The plea offered to Mr. Zaitar in 2012 had multiple advantages from the defense point of view:

> What I think made the agreement extremely, like an extremely good opportunity for Mr. Zaitar in this instance[,] was that not only did we agree [to] a range, but we agreed that both sides could argue, the Government could argue for enhancements, we could argue for

> departures and variances and we could go below.  We could go below
> the [G]uidelines.  That we thought was a very powerful development for
> us.
>
> That being said, our strategy was predicated around making the most
> persuasive argument that we possibly could in order to persuade the
> Court to impose the lowest sentence possible.
>
> [The strategy was] [t]o achieve, you know, we have 87 to 108 months.
> Our goal was to pull to achieve a result that was at the lower end of that
> range if not below that range.

Evidentiary Hearing Tr. at 140 (Liu).  Notably, the plea offer also contained a sentencing

calculation in the Guidelines range of 87 to 108 months (as with Mr. Awali), with identical

concurrent terms for both the cocaine and heroin conspiracies.  Defense counsel had repeatedly

attempted to obtain government agreement to a straight sentence of 87 months, but the

government insisted that a plea had to be based on the principles of the Guidelines, which

calculate sentencing ranges.  *Id.* at 136 (Liu) ("[G]iven that a straight sentence of 87 months

could not be offered by the Government.  The Government rejected that a number of times.  This

was our next best opportunity.").  Defense counsel believed that Mr. Zaitar "was happy with [the

plea offer].  I think he agreed that it was a big achievement."  *Id.* at 135 (Liu).

Certainly defense counsel thought they had well served their client.  Mr. Coburn

testified, "It is my testimony that I thought that if he went to trial it was very likely he was going

to be convicted."  *Id.* at 116-117.  In fact, defense counsel thought their entrapment defense was

"an awful defense" on the facts.  *Id.* at 95 (Coburn).  Mr. Coburn added the defense lawyers felt

"obliged to do everything possible within the bounds of, you know, the Rules of Criminal

Procedure and the Code of Ethics . . . to prepare the best possible defense.  That's what we were

bound and determined to do.  But that at least in my mind does not equate to like a personal

subjective belief that we were going to win.  I never had that."  *Id.* at 96.

Nonetheless, Mr. Zaitar testified that he initially rejected a close-to-final plea offer because the proposed sentence of 87-108 months was too long. *Id.* at 14 (Zaitar). Mr. Zaitar recalled that "Ms. Kristin," one of his lawyers, told him "you have to sign this, but there will be many factors that will make the Judge give you a lower sentence such as the fact that your son is at the hospital, that you have been in jail for five years and that you underwent surgery. All of these factors will make the Judge prone to give you a lower sentence." *Id.* at 15. He also recalled that Ms. Kristin told him that "there will be no justification, no reason whatsoever for the Judge to give the 108 [-month sentence]." *Id.* Although present when Ms. Kristin made these statements, Mr. Liu, the junior attorney, said nothing, and Mr. Coburn was not there. *Id.* at 16. Mr. Zaitar recalled that Mr. Coburn himself visited Mr. Zaitar the next day and assured Mr. Zaitar that the final sentence would be less than 80 months. *See id.* at 18 ("Throughout the conversation every time I told him that the 87 was too long he promised that it would be under 80. He said it four or five times during that conversation.").

Mr. Zaitar testified that a few days later, Ms. Kristin and Mr. Liu returned to talk with him about a plea. Again, Ms. Kristin did all the talking and Mr. Liu said nothing. Ms, Kristin reportedly said that Mr. Coburn "talks to Judge Collyer every day and they are friends since they were in college," and therefore Mr. Coburn could correctly predict the sentence. *Id.* at 21.[7] Mr. Zaitar's recollection was that "[a]ll she told me I would be sentenced for less than 87 months." *Id.* at 23.

According to Mr. Zaitar, Mr. Coburn himself visited Mr. Zaitar on the next day. Mr. Zaitar testified that "[h]e just came to me to convince me to sign and he said trust in me,

---

[7] For the record, the undersigned attended an all-women's college in the 1960s, long before Mr. Coburn was of college age. Evidentiary Hearing Tr. at 87. Judge and lawyer do not speak every day but do attend the same Inn of Court. *Id.* at 86.

trust in me, under 80.  Then the next thing he said was trust in me, trust in me, way under 80."
*Id.* at 27.  Correcting the interpretation offered by the certified court interpreter at the July 2014 hearing, Mr. Zaitar added, "I said that he hugged me and he said that this is the way home.  He said he was sure that it would be way under 80 and he hugged me and he said it will be my way home."  *Id.* at 27.  Mr. Zaitar's view was, "If they [were] not going to give me a light sentence where I can leave, then I want[ed] to go to trial."  *Id.* at 26.

Mr. Zaitar further testified that he never reviewed an Arabic translation of the final plea agreement with his attorneys, did not remember reading it in Arabic, did not remember seeing an Arabic translation, and never requested a copy in Arabic.  *Id.* at 35.  This careful testimony avoided mention of the fact that a court-certified interpreter interpreted the plea documents.  *See id.* at 57-58 (Court noting its question from the plea hearing, "Have these documents been translated into Arabic for you to understand and you said yes."); *see also* Plea Tr. at 6 (Court: "I have the plea papers in front of me.  Have these documents been translated into Arabic for you to understand?" Defendant: "Yes.").  Further, the Court reminded Mr. Zaitar that the plea documents were finalized on a Sunday, translated that evening by Interpreter Ghada Attieh, and delivered to him at approximately 8 am.  *See* Evidentiary Hearing Tr. at 57; *see also id.* at 67 (Coburn).  In response, Mr. Zaitar testified, "I can't say I didn't see it but what I'm saying even if they gave it to me in Arabic, I wouldn't read it because it would be meaning, the text would be meaningless. . . . However, I don't recall ever they gave me an Arabic text."  *Id.* at 57-58.  While Mr. Zaitar might not have paused to read the Plea Agreement in Arabic, the Court has no doubt that it was interpreted and provided to him early on the morning of his plea hearing.

On cross examination at the July 2014 hearing, Mr. Zaitar insisted that "[t]he most important factor though was when Ms. Kristin, when she told me that my case was not

worth more than 87 months.  And she told me it was out of question [sic], was completely
unforeseeable that the Judge would give you [sic] a 108 months [sentence]. . . . That was the
most important factor to me when my own attorneys assured me that my case was not much."
*Id.* at 33; *see also id.* at 48 (It "was my own counsel who took a look at the case.  That was his
job and he told me that my case did not warrant more than 80 months, less than 80 months.").

   Asked if, "after all of those meetings, you understood that the sentence was up to
the Court?," Mr. Zaitar responded:

> Yes, correct, and that's the reason I know that it was only up to the Judge
> to give the sentence but he told me that it was the Judge herself who said
> that she was going to move, she was going to give a lower sentence and I
> would have good credit with her if I signed and the Judge said that she
> was going to give me a lower sentence.  And that he was friends with the
> Judge since the days of college and the Judge told him that.

*Id.* at 33.[8]  Mr. Zaitar acknowledged that the Court described the Guidelines to him, *id.* at 45
("True."); that the Court told him that his sentencing range was 87-108 months, *id.* ("True"); that
the Court "advised . . . directly" that she did not know what sentence would be imposed, *id.*
("Yes."); and that the Court asked him if anyone had promised what the sentence would be and
Mr. Zaitar said no.  *Id.* at 46.  He then elaborated, "And exactly no one promised me exactly how
much, but they promised me below 80.  And during the consultation with me they said that the
Judge could not possibly impose more than 87 months under the circumstances of the case, there
was no way for the Judge to give me the 108 months."  *Id.*

   At the July 2014 hearing, the Court questioned Mr. Zaitar about the two
sentencing hearings.  Mr. Zaitar recalled that "the presentencing report had stated too high of

---

[8] As happened repeatedly in Mr. Zaiter's recollections, his testimony was less than clear as to
whether Ms. Kristin or Mr. Coburn said that Mr. Coburn knew the Judge since college.  Since
Mr. Zaitar's more specific and direct testimony attributes this statement to Ms. Kristin (and Mr.
Coburn acknowledged that the facts are to the contrary, *see id.* at 87), the Court finds that this
testimony references statements from Ms. Kristin.

level for me," requiring the second hearing.  *Id.* at 49.  The Court reminded him that the higher

level resulted "because the probation office included the drugs that your brother and Mr. Awali

had been involved with."  *Id.* at 50.  Mr. Zaitar responded:

> That is the point.  This is exactly the point.  How could my lawyer when
> he's a man of law [] not see it coming, did not see that I was going to be,
> I was going to be punished for the drugs brought into my case and Mr.
> Awali's, in my brother and Mr. Awali's cases?  How could he [not]
> predict it?"

*Id.*  The Court then informed Mr. Zaitar that Mr. Coburn had "argued very hard" against

including the drugs from Mr. Zaitar's co-defendants, *id.* at 51, and that the Court had ultimately

decided to sentence Mr. Zaitar within the range of his plea agreement, without regard to those

drug amounts.  Mr. Zaitar insisted that the circumstances were "additional evidence that [Mr.

Coburn] was being an ineffective counsel."  *Id.*

For the necessary purposes of the July 2014 hearing on alleged ineffective

assistance, the Court ruled that defense counsel could testify to conversations with Mr. Zaitar

only as to "those conversations that are necessary for purposes of defending against the

ineffective assistance of counsel charge and not other matters."  *Id.* at 63.  Thereafter, the

Government called Messrs. Coburn and Liu to testify.

Mr. Coburn testified that the plea agreement was translated into Arabic for Mr.

Zaitar.  *Id.* at 66.  He further testified that plea negotiations involved "numerous conversations

between myself and the defendant regarding one version or another of the plea agreement," after

a "lot of discussions" on various plea offers with the government.  *Id.* at 68.  Mr. Coburn noted

that interpreter Ghada Attieh "was part of a number of those conversations [although] [n]ot

necessarily all of them."  *Id.*  Mr. Coburn "thought that Mr. Zaitar's English was really good.

It's not to say that he spoke it like a native English speaker.  Bur he and I had lengthy

conversations over the course of quite a number of months in English, and it was my view that, my sense of it that[,] he clearly understood me and he was actually I thought very articulate and unusually articulate in fact in English." *Id.* at 69-70.  He added, "This was kind of a, you know, pretty intensive kind of communication in which he was a very meaningful participant.  It was clear that he understood what I was saying and that he understood what he was saying." *Id.* at 71.  Mr. Coburn further testified that he reviewed every provision of the Plea Agreement with Mr. Zaitar, *id.* at 71; statutory penalties, *id.*; maximum and minimum penalties, *id.* at 72 ("There is no doubt I told him that."); sentencing guidelines, *id.* at 72-73; the PSR process, *id.* at 73-75; that the Court was not bound by the parties' agreements on sentencing, *id.* at 75 ("I told him absolutely the Court is not [bound] . . . [m]ore than once.").  Mr. Coburn read the Plea Agreement to Mr. Zaitar, word for word.  *Id.* at 106 ("I have a clear recollection of going through the plea agreement with Mr. Zaitar word by word which I would do every single time [with a client].");  *id.* at 117 ("I read every word to him.").

As to any promise on a sentence, Mr. Coburn testified:

> [There was] a series of conversations . . . relating to the question that was very much in his mind in terms of, you know, what will I get?  What's going to happen to me?  What's my sentence going to be?  So there were a lot of conversations going to that issue.
>
> And in the midst of those conversations, you know, I would tell him that the Court is not [bound.]  The Court is not bound by the plea agreement.  The Court is not bound by what the presentence report said.  That was very clear, made very clear to Mr. Zaitar.

*Id.*  Mr. Coburn told Mr. Zaitar that "there was going to be a lot of attention paid in our submission to the extremely unfortunate health problems his son was experiencing back in Lebanon." *Id.* at 76.  *See, e.g.*, 08-cr-123, Sentencing Memoranda, Dkts. 149, 151 (under seal).

Mr. Coburn further testified:

> I told [Mr. Zaitar] that given the federal sentencing guidelines range that
> was going to be determined in this case was not going to be mandatory,
> Judge Collyer was going to have a great deal of discretion in deciding
> how to sentence him.  That he might be sentenced within a range, that it
> was my hope and I actually thought it was fairly likely that we would be
> successful in persuading the Judge to sentence him below the range.
> And that one of the key factors that we hoped to invoke in that process
> was going to be a pretty detailed and I hope vivid description of his son's
> health status.

*Id.* at 77.  Asked directly if he "ever promise[d] the defendant during your plea discussions that
the Court would impose a specific sentence," Mr. Coburn answered, "No, very much to the
contrary. We told Mr. Zaitar repeatedly and he acknowledged repeatedly that, that we could not
promise him what would happen and that the Court could not be bound by any request or
suggestion that we would make and that it was up to the Court's discretion."  *Id.*  Further, he
testified that "in virtually every one of these conversations I emphasized to him again, not just
once but repeatedly, that we could not promise what would happen.  That we could not control
what the Judge would do."  *Id.* at 79.   Mr. Coburn was quite specific that he told Mr. Zaitar on
"multiple occasions" that the court had "very wide discretion in how to sentence him and that he
could be sentenced on the high end of the range and he could be sentenced frankly above that."
*Id.*  However, Mr. Coburn also acknowledged the trusting relationship between client and lawyer
and that:

> [I]t is true that the fact that I told him that I thought there was, there was
> a lot of different phraseology here, something to the effect of a good
> chance, a very good chance, I thought that there was a good chance that
> he could get, you know, 80 months or under.
>
> There is no question and I say this in fairness to Mr. Zaitar like I said,
> there's no question in my mind that that view that I held was a
> substantial factor in his deciding to plead guilty.

*Id.* at 92; *see also id.* at 98 ("I believe [my view] was a substantial, very substantial factor in Mr.

Zaitar's calculus to plead guilty.  That I thought it was likely, that I thought it was a real

significant likelihood that we could persuade the Judge to go down to 80, even possibly lower

than 80 months.  That I think that was a significant factor. But if I hear your question correctly, it

sounded like you suggested I assured him of that.  That is incorrect.  I never assured him of

that.").[9]  Mr. Coburn further testified that he thought the negotiated drug levels in the Plea

Agreement were correct, *id.* at 100, but that if ("a hypothetical") he had known that the PSR

would recommend a higher range that in the Plea Agreement, "I would not have told him that I

thought it was likely that we could persuade the Judge to go under 80 months."  *Id.* at 101.

　　　　After the PSR was issued, with its inclusion of Messrs. Awali and Zhayter's

admitted drug quantities as related conduct, Mr. Coburn discussed the issues "[i]n excruciating

detail" with Mr. Zaitar.  *Id.* at 83.

> Well, I told him that . . . I was concerned about the fact that the probation
> officer had . . . imported her calculation of the relevant quantity of drugs
> from information she had learned from the sentencing process relating to
> Mr. Zaitar's co-defendants.  His two co-defendants related to the two
> cases as opposed to the suggested relevant quantity in the plea
> agreement.
>
> And it's not like this is an improper thing to do but I told him that I was
> surprised, something to that effect, that she had done that and this was
> going to pose, you know, a significant problem that we are going to have
> to deal with.

---

[9]   When he heard after sentencing that Mr. Zaitar felt betrayed by the length of his sentence, Mr.
Coburn wrote to Mr. Zaitar acknowledging "I most certainly did tell you that I thought it was
unlikely that she, Judge Collyer, would go over 80 months."  Evidentiary Hearing Tr. at 92. *See
also id.* ("[T]he way I put it to him during the numerous times I talked to him about this . . . was
essentially I felt a high degree of confidence that we could persuade the Judge to sentence him at
80 months or below . . . [which]was a significant factor" in Mr. Zaitar's plea.); *id.* at 99 ("I never
told him it would happen.  I never promised him that it would happen, that the Judge would do it,
that I would be successful.  I never promised him that.  I told him that I thought there was a
significant likelihood, a real likelihood that we could achieve that, that's what I told him.").

. . .

> [Mr. Zaitar] was not pleased to hear it, but my impression was that he
> was acting rationally.  And we explained to him what we thought we had
> to do and my impression was that he acknowledged and understood that
> that's what we were going to do.

*Id.* at 83-84.

Both parties urged the Court to sentence Mr. Zaitar within the negotiated
Guidelines range.  Mr. Zaitar's lawyers filed a Memorandum Concerning Relevant Conduct
arguing forcefully that the Court should limit its sentence to the "unambiguous, agreed-upon,
stipulated base offense level yielding a sentencing range of 87 to 108 months," Def. Conduct
Mem. at 2, for both fairness and legal reasons.  The Government urged the Court to accept the
negotiated plea agreement.  *See* Gov. Supp. Mem. at 1.

## IV.

Mr. Zaitar makes two separate arguments to support his claim of ineffective
assistance of counsel: first, that Mr. Liu and Mr. Coburn were ineffective in not realizing that the
drug quantities to which Messrs. Awali and Zhayter pled guilty could be relevant conduct to
increase Mr. Zaitar's Guidelines sentencing range; and second, that both counsel were ineffective
in promising Mr. Zaitar a sentence no longer than 87 months, and perhaps less than 80 months,
because he would have refused to entertain a plea to any more time in prison and would have
gone to trial.

Before turning to the analysis of each point, the Court notes that Mr. Zaitar offers
no evidence—indeed, the evidence is entirely to the contrary—that Mr. Liu played any part in
providing him allegedly ineffective advice (either misreading the Guidelines or promising a low
sentence).  Mr. Zaitar's own testimony identifies Ms. Kristin or Mr. Coburn as advisors on these
points but not Mr. Liu.

Because Mr. Zaitar offers no evidence that Mr. Liu failed to provide effective assistance of counsel, his complaint against Mr. Liu will be summarily dismissed. (That Mr. Liu was "heavily involved" in the defense, Evidentiary Hearing Tr. at 68, does not overcome Mr. Zaitar's admissions that Mr. Liu said nothing to him about the Plea Agreement.) The Court also notes that Mr. Zaitar does not claim that Ms. Kristin provided ineffective assistance of counsel and that he did not call her as a witness. Accordingly, only Mr. Zaitar's complaint against Mr. Coburn remains to be addressed.

### A.   Alleged Failure to Predict Relevant Conduct

In contending that Mr. Coburn was ineffective because he did not predict that drug amounts admitted by codefendants would be deemed relevant conduct to his crimes, Mr. Zaitar has powerful support: Mr. Coburn himself. The Memorandum Concerning Relevant Conduct acknowledged that "we did not advise our client that there was any significant likelihood that the Court might reject the range in the plea agreement . . . . Accordingly, should it occur, this may well lead to a cognizable allegation of ineffective assistance of counsel." Def. Conduct Mem. at 12-13. On legal, humanitarian, and fairness grounds, Mr. Coburn argued strongly for a sentence within the negotiated range of 87 to 108 months. The Government also requested "that the Court impose base offense level 30, consistent with the plea agreement." Gov. Supp. Mem. at 1.

At final sentencing in October 2012, the Court determined that it had authority to include the codefendants' admissions on drug quantity as related conduct to Mr. Zaitar's admitted crimes.[10] The Court then declined to do so, finding that the resulting Guidelines

---

[10]  *See, e.g.*, U.S.S.G. § 6B1.4 & cmt. (2011); U.S.S.G. § 1B1.3(a)(1)(A) & (B); U.S.S.G. § 1B1.3 cmt. N.2 (2011). However, the matter was not simple. *See* Evidentiary Hearing Tr. at 107 (Court: "I thought the argument was not just relevant conduct from a co-conspirator. It was

sentence would be greater than necessary under 18 U.S.C. § 3553(a) ("sufficient but not greater

than necessary").  Instead, as Mr. Zaitar had argued, the Court limited its sentence to the

"unambiguous, agreed-upon, stipulated base offense level yielding a sentencing range of 87 to

108 months," Def. Conduct Mem. at 2, and at base offense level 30 to be served concurrently, as

the Government had urged for both conspiracies with which Mr. Zaitar was involved.

Mr. Zaitar's complaint of ineffective assistance of counsel for not predicting a

Guidelines calculation that the Court declined to adopt—because both sides urged it not to do

so—fails for want of a factual underpinning.  *Cf. United States v. McCoy*, 215 F.3d 102 (D.C.

Cir. 2000) (defense counsel and prosecutor failed to account for career offender status, which led

to longer sentence than plea agreement anticipated).  The facts are that the drug quantities to

which Mr. Zaitar's codefendants pled guilty were *not* included as related conduct to his own

admitted quantities for purposes of sentencing and the Court did *not* sentence him to a sentence

longer than agreed to in his Plea Agreement because of such drugs.

Rather, the Court sentenced Mr. Zaitar to the top of his negotiated Guidelines

sentence because, unlike his codefendants, he was involved in *two* separate conspiracies and

because the Government's extensive memoranda in aid of sentencing proffered the details on

which his plea agreements and guilty pleas were based and to which Mr. Zaitar makes no claim

of factual error.  *See* Case No. 07-cr-329, Dkts. 61, 68.  Mr. Zaitar's sentence was unrelated to

the alleged ineffective failure to predict relevant conduct in his Guidelines calculation.  Thus, the

Court concludes that Mr. Coburn did not provide ineffective assistance to Mr. Zaitar on this

basis.

---

relevant conduct in another case where somebody else had pled guilty to a different set of facts.
So it wasn't people in the same conspiracy which would happen all the time.  It was a very
strange experience which I have never had before which is why I had everybody brief it.").

### B.   Alleged Promised of Lower Sentence

Some brush must be cleared before addressing Mr. Zaitar's argument on the alleged promise of a lower sentence: Mr. Zaitar does not argue that there was no advantage to his Plea Agreement, that is, he faced much longer sentences if convicted as charged, and sentences for each conspiracy (cocaine and heroin) could be served consecutively; Mr. Zaitar does not argue that the Court sentenced him above the negotiated range in his Plea Agreement, to which he expressly agreed orally and in writing; Mr. Zaitar does not argue that there was any language deficiency in his understanding of the plea documents or the potential sentencing range and, instead, testified to the contrary;[11] Mr. Zaitar does not argue that he did not understand that his sentence would ultimately be determined by the presiding judge, in her discretion; Mr. Zaitar does not challenge, or even mention, his plea colloquy; and, finally, Mr. Zaitar does not argue that he is not guilty, as he admitted during his plea and which admission the Government might use against him if his guilty plea were vacated.  *See* Plea Agreement, Dkt. 45, ¶ 16.

The only issues are whether Mr. Coburn provided ineffective assistance of counsel by promising Mr. Zaitar a lower sentence and whether Mr. Zaitar would not have entered a plea had he appreciated the possibility of a sentence at the top end of the Guideline range to which he agreed.  *See Strickland*, 466 U.S. at 687 (Mr. Zaitar must establish (1) that counsel's performance was deficient, and (2) that counsel's "deficient performance prejudiced

---

[11]   Mr. Zaitar's current lawyer argues that he is "not fluent in English," Def. Mem. at 3.  This is an accurate statement.  However, to the Court's own observation, Mr. Zaitar became increasingly competent in understanding spoken English between 2008 and 2012 and his lack of fluency did not inhibit his own statements to the Court.  A certified Arabic interpreter was present for all in-court hearings and defense counsel relied on a certified Arabic interpreter for many meetings with Mr. Zaitar, especially those relating to legal issues under U.S. law.  *See* Evidentiary Hearing Tr. at 128 (Liu) ("I'm certain that we spoke with him in, with an interpreter in Arabic and went through the entire plea agreement but there may also have been conversations in English."); *see id.* at 129-139 (Liu noting that in regard to legal terms and issues relating to sentencing and extraterritorial application of laws were explained in Arabic).

the defense").  The latter question is whether "'there is a reasonable probability that, but for

counsel's [advice], [Mr. Zaitar] would have not pleaded guilty and would have insisted on going

to trial.'  In this context, a 'reasonable probability' is one 'sufficient to undermine confidence' in

the defendant's decision to plead guilty."  *McCoy*, 215 F.3d at 107 (quoting *Strickland*, 466 U.S.

at 694).  Mr. Zaitar does not need to show that he would have been acquitted, only that "he

'would have gone to trial.'"  *United States v. Hanson*, 339 F.3d 983, 991 (D.C. Cir. 2003)

(quoting *McCoy*, 215 F.3d at 108).

Only upon detailed and lengthy consideration of the record does the Court

conclude that (1) Mr. Coburn did not "promise" a light sentence but could have been so

understood by his client and (2) there is no proof of prejudice to Mr. Zaitar because it is highly

improbable that Mr. Zaitar would have risked trial on two separate conspiracies, only to receive a

longer prison term that would have prevented his return to Lebanon.

First, by his own fully credible admissions, Mr. Zaitar's attention was totally

consumed by a number: whatever was the lowest number of months' incarceration he might

expect.  He knew that his lawyers could not get the government to agree to a sentence of only 87

months for the two cases, which was repeatedly requested.  Eventually, however, the government

agreed to a Guidelines range of 87-108 months and agreed that both parties could argue for lower

or higher prison terms.  This point was explicitly made by Mr. Coburn at Mr. Zaitar's plea

hearing.  The Court credits Mr. Liu's testimony and finds that the government's ultimate

agreement that the defense could argue for a sentence lower than that calculated in the plea

agreement, which defense counsel had long sought, was recognized by Mr. Zaitar as a significant

achievement.

As a result of this flexibility, however, the Court concludes that Mr. Zaitar did not pay attention to, or really hear, Mr. Coburn's cautions that his sentence could be greater than 87 months.  Focused as he was on the lowest number possible—and hearing that his sentence could be lower than 87 months—Mr. Zaitar paid no attention to counsels' repeated warnings that he could receive a longer sentence from the judge.  Notably in this regard, Mr. Zaitar may not have reviewed the Arabic-language versions of the Plea Agreement and documents that were provided to him because, the Court finds, prior discussions with an Arabic interpreter had occurred, Mr. Coburn had read every line to him in English and explained the documents, and Mr. Zaitar was solely focused on the lowest number of months to which he could potentially be sentenced, which had not changed.

Second, the Court finds that Mr. Coburn did *not* advise Mr. Zaitar that his case was not serious enough to warrant a sentence of 108 months or that the presiding judge would never go that high because of a long friendship with Mr. Coburn.[12]  *See* Evidentiary Hearing Tr. at 87.

Third, the Court concludes that Mr. Coburn fully read and explained the Plea Agreement, the judge's discretion, and the risks at sentencing to Mr. Zaitar. In this assessment, the Court credits Mr. Coburn's repeated statements that he discussed fully with Mr. Zaitar the terms of the Plea Agreement and the potential outcomes.  It also credits Mr. Coburn's candid testimony that Mr. Zaitar trusted him and that Mr. Zaitar entered his plea, at least in part, based on that trust.

---

[12] Mr. Zaitar attributed these statements to Ms. Kristin.  However, Mr. Zaitar does not complain about Ms. Kristin's advice, he did not call her as a witness, and he makes no argument that her alleged statements should be attributed to the law firm.  The Court finds that Mr. Zaitar has waived any such arguments, if such could be made.

Fourth, the Court finds that Mr. Coburn advised Mr. Zaitar that it was "likely" or there was "a very good chance" that Mr. Coburn would be able to persuade the Court to impose a sentence at or below 87 months, the bottom of the Guideline range in the Plea Agreement.  Both client and lawyer agree that Mr. Zaitar pinned his hopes on a low sentence when he agreed to enter a guilty plea.  Mr. Coburn's hopeful predictions were not unfounded as Messrs. Zhayter and Awali had already been sentenced (on June 14, 2012 and July 17, 2012, respectively) to terms lower than their respective Guidelines ranges based, in part, on *Smith* departures.  *See United States v. Smith*, 27 F.3d 649, 649 (D.C. Cir. 1994) (finding permissible a "depart[ure] below the range indicated by the Sentencing Guidelines where the defendant, solely because he is a deportable alien, faces the prospect of objectively more severe prison conditions than he would otherwise").  A *Smith* departure from the low end of the Guidelines range in Mr. Zaitar's Plea Agreement would have resulted in a sentence of 81 months; had the Court further been influenced by the injuries to Mr. Zaitar's son, the sentence might have been less.

Fifth, the Court has carefully considered the testimonial credibility of the witnesses.  After years of experience with Mr. Zaitar, it is the Court's view that his testimony reflected an exaggerated representation of events, but that these exaggerations were not rooted in untruthfulness; rather, they were the result of a non-fluent English speaker attempting to emphasize his points and ensure understanding in a foreign language.  Mr. Coburn was credible, if cautious, as demonstrated by his testimony contrary to his own interests.  Mr. Liu was a completely straight-forward witness and is fully credited.

For these reasons, the Court concludes that Mr. Zaitar was fully advised concerning sentencing and that no promise was made by defense counsel.  Nonetheless, in deciding to plead guilty, Mr. Zaitar focused on Ms. Kristin's statement that his crimes were not

serious enough to warrant a sentence of 108 months and on Mr. Coburn's statements that it was "likely" or there was "a very good chance" that Mr. Zaitar could be sentenced at or lower than 87 months.

If Mr. Coburn's predictions of the likelihood of a lower sentence were deemed promises of a lower sentence, contrary to this Court's findings, the Court further concludes that Mr. Zaitar was not prejudiced thereby.

Having been away from home for years prior to his arrest in Romania, Mr. Zaitar is now consumed by anxiety for his son, who was injured in a hit-and-run automobile accident, and his wife, who has to bear all burdens alone. *See* Supplemental Letter from Yahya Zaitar (Supp. Letter), Dkt. 105. Wanting to reduce his sentence of 108 months, he argues that (1) he would have rejected the plea offer of 87-108 months (as he did once before); (2) gone to trial except for bad legal advice; (3) so that he should *now* have the chance to go to trial. But trial now would still entail evidence of two separate conspiracies (cocaine and heroin), for which Mr. Zaitar was the alleged leader, with drug quantities potentially greater than those to which his co-defendants in each case pled guilty. Mr. Coburn anticipated a guilty verdict after trial, which is one reason he encouraged Mr. Zaitar to accept the plea offer to a lesser sentence in prison. *See* Evidentiary Hearing Tr. at 96 (Coburn) (noting that he "never" had "a personal subjective belief that we were going to win" at trial). A guilty verdict on the two Superseding Indictments would have resulted in a prison term of greater duration than 108 months and, perhaps, separate terms to be served consecutively. Further, if Mr. Zaitar were depending on legal arguments to overturn any guilty verdicts at trial (all pre-trial legal arguments having been decided), his time in prison awaiting a reversal, if it happened at all, would have almost equaled the sentence imposed under his Plea Agreement and could have merely resulted in a remand for a new trial. Mr. Zaitar's

personal anxiety about his family members does not change the cold calculus that going to trial would have been the surest way to delay his return home.

In this analysis, the Court does not overlook the principle that ineffective counsel is shown when it prevented a defendant who wanted a trial from going to trial, not only when the defendant would have been acquitted at trial. *See, e.g., Hanson*, 339 F.3d at 991. That principle is inapplicable in this matter. Mr. Zaitar admitted his guilt and does not challenge that admission now. As it was then, it remains now: Mr. Zaitar's focus lies solely on how he might most immediately get home to Lebanon. *See* Supp. Letter (stating that he doesn't want to "hurt or make trouble" for anyone, especially Mr. Coburn, he just wants to go home to his son). Given that consistent focus, the Court finds that no prejudice resulted from the alleged "promise" of a shorter prison term. Mr. Zaitar is already serving a shorter prison term than he would have received if a jury declared him guilty after trial on all charges. His ostensible goal from this challenge to the effectiveness of counsel is a trial with a new lawyer; such a result would only extend his time in the United States and harm his real goal, which is going home as soon as possible.

In pursuit of this real goal, Mr. Coburn accurately and truthfully advised that Mr. Zaitar's plea was "the way home," even if the imposed prison term is longer than either man anticipated or hoped for. The Court cannot accept Mr. Zaitar's representation that he would have gone to trial because it would have significantly prolonged his stay in this country.

For these reasons, the Court finds that the there was no promise and Mr. Coburn did not provide ineffective assistance of counsel. Rather, Mr. Coburn urged his client to agree to a plea agreement to 87-108 months for two separate drug conspiracies, and then extensively prepared for, and made, arguments at sentencing that could have reduced Mr. Zaitar's sentence

to 80 months or lower, had the Court accepted his arguments.  The plea, despite a sentence of 108 months (with credit since arrest in Romania on a U.S. warrant issued in April of 2008) served Mr. Zaitar's goal of finding the fastest way home.

**V.**

For the reasons set forth above, Yahya Zaitar's motion to withdraw his guilty plea based on ineffective assistance of counsel, Dkt. 99, will be denied. A memorializing order accompanies this Opinion.

DATE: January 13, 2015

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
